The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
July 23, 2020

## 2020COA112

**No. 18CA1557, *People v. Ambrose* — Crimes — DWAI; Vehicles and Traffic — Alcohol and Drug Offenses — Certification of Breath Test Instruments; Constitutional Law — Sixth Amendment — Confrontation Clause**

As a matter of first impression in Colorado and consistent with other jurisdictions, a division of the court of appeals holds that a "working order" certificate generated by an Intoxilyzer 9000 (I-9000) machine is not testimonial and does not implicate a defendant's confrontation rights. The division concludes that such certificates are admissible if they comply with the requirements of section 42-4-1303, C.R.S. 2019, and that evidence related to the machine's reliability goes to the weight of the evidence, not its admissibility.

The division also concludes that a deputy's opinion that the I-9000 was working properly constitutes an expert opinion that was

erroneously admitted as a lay opinion, but that any error was harmless.

Finally, the division rejects the remaining contentions that the trial court erroneously (1) found the arresting officer had reasonable suspicion; (2) failed to remove a biased juror for cause; (3) found the prior driving under the influence convictions a sentence enhancer rather than an element of the offense; (4) denied an evidentiary hearing on the admissibility of the breath test result; and (5) violated double jeopardy by imposing the persistent drunk driver surcharge after sentencing.

Court of Appeals No. 18CA1557
Rio Blanco County District Court No. 17CR71
Honorable Anne K. Norrdin, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

William Edward Ambrose,

Defendant-Appellant.

_____

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE FREYRE
Lipinsky, J., concurs
Terry, J., concurs in part and dissents in part

Announced July 23, 2020

_____

Philip J. Weiser, Attorney General, Brittany L. Limes, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith E. O'Harris, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     In this impaired driving case, we are asked to decide a novel issue related to the Intoxilyzer 9000 machine (I-9000). Each time the I-9000 is used to measure a person's breath alcohol content (BAC), it generates a BAC result and a separate document that certifies the machine is working properly and is certified for use during a specific range of dates. The question presented here is whether that "working order" certificate is testimonial and implicates a defendant's confrontation rights under the Sixth Amendment to the United States Constitution. We conclude, consistent with every state to have considered this issue, that this certificate is not testimonial and, thus, does not implicate the Confrontation Clause.

¶ 2     Defendant, William Edward Ambrose, appeals the judgment entered after a jury convicted him of felony driving while ability impaired (DWAI). He contends that the trial court reversibly erred by (1) finding the arresting officer had reasonable suspicion; (2) failing to remove a biased juror for cause; (3) refusing to submit the issue of prior alcohol convictions to the jury to determine beyond a reasonable doubt; (4) failing to grant an evidentiary hearing on the admissibility of the I-9000 breath test results; (5) allowing a

deputy's expert testimony disguised as lay testimony concerning the I-9000's operations; (6) admitting the I-9000 certificate document contrary to the relevant statute's requirements and in violation of his confrontation rights; and (7) imposing the persistent drunk driver surcharge after sentencing in violation of his right to be free from double jeopardy. We discern no reversible error and affirm the judgment.

## I. Factual Background

¶ 3 While on patrol and stopped in a highway pullout, Deputy Corey Dilka saw a car pass him with a dimly lit left taillight. He followed the car and as he got closer, he no longer saw any light coming from the left taillight. Instead, he saw a steady white light. Believing a traffic infraction had occurred, Deputy Dilka activated his emergency lights, pulled the vehicle over, and contacted Mr. Ambrose, who was driving.

¶ 4 While speaking with Mr. Ambrose, Deputy Dilka detected "an odor of an unknown alcoholic beverage" coming from the vehicle and saw that Mr. Ambrose's eyes were glassy. After learning from dispatch that Mr. Ambrose had active restraints on his driver's license in other states, Deputy Dilka asked Mr. Ambrose to step out

2

of the car.  Deputy Dilka again detected an odor of an alcoholic beverage, this time coming from Mr. Ambrose.

¶ 5     Mr. Ambrose subsequently consented to performing voluntary roadside maneuvers.  After observing several clues of impairment, Deputy Dilka placed Mr. Ambrose under arrest on suspicion of driving under the influence.  Mr. Ambrose agreed to a breath test, which revealed a BAC of 0.063.

¶ 6     As relevant here, prosecutors charged Mr. Ambrose with a count of felony DWAI (felony fourth offense) and driving without a valid license.[1]  The jury convicted him of DWAI and acquitted him of driving without a valid license.  In a bench trial, the trial court found that the prosecution had established the existence of three prior convictions for alcohol-related offenses, thereby elevating Mr. Ambrose's DWAI conviction from a misdemeanor to a class 4 felony. The trial court sentenced Mr. Ambrose to three years in community corrections, but it said nothing about the persistent drunk driver

---

[1] The People initially charged Mr. Ambrose with failure to provide insurance and failure to display proper taillights as well.  Before trial, the prosecution dismissed the taillight violation, and during trial, the court dismissed the failure to provide insurance count.

surcharge at the hearing. The mittimus, however, reflected this surcharge.

## II. Reasonable Suspicion

¶ 7    Mr. Ambrose first contends the trial court erroneously found that Deputy Dilka had reasonable suspicion to initiate a traffic stop. He moved to suppress evidence of impairment obtained as a result of the stop, but the trial court denied his motion. Considering the totality of the circumstances, we discern no error.

### A. Standard of Review and Relevant Law

¶ 8    A trial court's ruling on a motion to suppress presents a mixed question of fact and law. *People v. Montante*, 2015 COA 40, ¶ 59. We defer to the court's findings of fact if they are supported by the record, and we review de novo the court's legal conclusions. *Id.*

¶ 9    The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. "A warrantless search and seizure is unreasonable unless it is justified by one of the few, specifically established exceptions to the Warrant Clause of the Fourth Amendment." *People v. Revoal*, 2012 CO 8, ¶ 10.

¶ 10    An investigatory stop is permitted if the officer has "a reasonable suspicion that criminal activity has occurred, is taking place, or is about to take place." *Id.* (citation omitted). "Reasonable suspicion is both a qualitatively and quantitatively lower standard than probable cause. That is, it can be supported both by less information and by less reliable information than is necessary to establish probable cause." *People v. King*, 16 P.3d 807, 813 (Colo. 2001).

¶ 11    To determine whether an investigatory stop is valid, a court must consider the facts and circumstances known to the police officer at the time of the stop. *Revoal*, ¶ 11. To justify an investigatory stop, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). An "unarticulated hunch" is not sufficient. *Revoal*, ¶ 11 (citation omitted). This inquiry focuses on an "objective analysis of whether a reasonable, articulable suspicion exists and not on the subjective intent of the officer." *People v. Reyes-Valenzuela*, 2017 CO 31, ¶ 12.

## B. Analysis

¶ 12    Here, Deputy Dilka had reasonable suspicion to stop Mr. Ambrose for a suspected motor vehicle equipment violation. Section 42-4-215(6), C.R.S. 2019, provides that "[a]ny motor vehicle may be equipped with not more than two back-up lamps either separately or in combination with other lamps, but no such back-up lamp shall be lighted when the motor vehicle is in forward motion." Deputy Dilka testified that once he got behind Mr. Ambrose's car, he saw that the left taillight emitted a steady white light instead of a red light. The officer's observation of a white light coming from the area where the backup light was located was enough to justify the stop. *See People v. Chavez-Barragan*, 2016 CO 16, ¶ 10 ("Suspicion of even a minor traffic offense can provide the basis for a stop.").

¶ 13    We are not persuaded by Mr. Ambrose's argument that the stop was unreasonable because Deputy Dilka testified that he stopped Mr. Ambrose for a different equipment violation under section 42-4-206(1), C.R.S. 2019. That statute says that "every vehicle registered in this state and manufactured or assembled after January 1, 1958, must be equipped with at least two tail lamps

6

mounted on the rear." § 42-4-206(1). Mr. Ambrose argues that because his vehicle displayed Wisconsin plates and presumably was not registered in Colorado, Deputy Dilka did not have a reasonable articulable suspicion to initiate a traffic stop. We disagree.

¶ 14    As our supreme court has reiterated, the reasonable suspicion standard is an objective one, and is not one that focuses on the officer's subjective intent. *See Reyes-Valenzuela,* ¶ 12. Deputy Dilka's observation of a continually illuminated white light supports an objective belief that Mr. Ambrose's car may have had a back-up light that was lit even though the vehicle was moving forward, contrary to section 42-4-215(6) ("[N]o such back-up lamp shall be lighted when the motor vehicle is in forward motion."). Indeed, a police officer does not have to observe a traffic violation to initiate a stop; the officer can also initiate a stop if the officer has a "reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *People v. Johnston,* 2018 COA 167, ¶ 20 (quoting *United States v. Botero-Ospina,* 71 F.3d 783, 787 (10th Cir. 1995)). The existence of out-of-state plates does not alter the analysis because section 42-4-215(6) does not require the vehicle to be registered in Colorado.

¶ 15    Since we conclude that Deputy Dilka had a reasonable suspicion to initiate a traffic stop under section 42-4-215(6), we need not address Mr. Ambrose's remaining arguments concerning the mistake of law exception. *See People v. Curtis*, 2014 COA 100, ¶ 12 (applying the principle of judicial restraint: "if it is not necessary to decide more, it is necessary not to decide more") (citation omitted).

## III.    Biased Juror

¶ 16    Mr. Ambrose next contends that the trial court erroneously denied his challenge for cause to Juror C.J. Specifically, he faults the court for failing to rehabilitate or otherwise ensure Juror C.J.'s ability to be fair and impartial after she indicated (by raising her hand) that (1) she agreed it was always wrong to drive after having a drink and (2) a person accused of doing something wrong should explain himself or herself. Based on our consideration of the entire voir dire, we discern no reversible error with respect to the first point, and we decline to consider the second point because it is raised for the first time on appeal.

## A. Additional Facts

¶ 17 The trial court began voir dire by reading pertinent rules of law (including the presumption of innocence and the burden of proof) and inquiring about the statutory disqualifications for jury service. At the end of this process, the court asked, "Is there anyone who wants to bring anything to my attention? No hands are raised."

¶ 18 The prosecutor then inquired about the prospective jurors' ability to follow the law, asking whether anyone would just say to themselves, "I'm going to go ahead and, and just say this shouldn't be a crime" or "I'm not going to follow what I don't believe in." Juror C.J. did not raise her hand.

¶ 19 The prosecutor then asked, "Has anyone here ever had to take away somebody's keys?" Juror C.J. raised her hand and explained that she once worked as a bartender and had taken patrons' keys away. When asked what helped her make that decision, Juror C.J. responded, "Observation and erring on the side of safety."

¶ 20 No prospective jurors raised their hands after the prosecutor asked them whether they felt so strongly about alcohol that they necessarily would render a guilty verdict, or whether anyone did not trust law enforcement.

¶ 21    Defense counsel began voir dire by asking the panel members if they "think[] that it's never okay or not okay to have a beer and then go drive a car?"  Several prospective jurors, including Juror C.J., raised their hands.  Counsel then followed up with a different juror, Juror R.N., in the following colloquy:

> [Counsel]: So [Juror R.N.], I want to ask you a question.  If you're told that there's a rule in Colorado, a law in Colorado that in some circumstances it is legal, it is not illegal to have a drink and then get in a car.  That sounds to be contrary to what your life beliefs are.  Is that fair?
>
> [Juror R.N.]: Yes.
>
> [Counsel]: Okay.  And if you were asked to raise your hand and swear an oath that you could follow that rule, is that something that you would struggle with?
>
> [Juror R.N.]: Probably —
>
> [Counsel]: Okay.
>
> [Juror R.N.]: — yeah.
>
> [Counsel]: And thank you for your honesty. And again, this is what this whole process is about.  Is talking through stuff like that.  So I really appreciate that.  Is it fair to say some little defense lawyer isn't going to change your mind about that thinking[?]  You've had this belief for 40 years.
>
> [Juror R.N.]: Yes.

10

[Counsel]: Okay. Fair to say that whatever he says, he's not going to change your mind about your beliefs.

[Juror R.N.]: No.

[Counsel]: And even the Judge. Fair to say that if she tells you otherwise, these are your thoughts right now.

[Juror R.N.]: No, because mine's based on actually a higher calling. My Christianity. I, I believe that you're responsible for your own actions. Anybody.

[Counsel]: Fair enough. And I think that's —

[Juror R.N.]: (Indiscernible).

[Counsel]: -- that's very commendable. And so this is something that goes even deeper to you. It's —

[Juror R.N.]: Yes.

. . . .

[Counsel]: Okay. Well, I appreciate that, Juror R.N. *Who here agrees with [Juror R.N.] that if they're told that rule, that in some circumstances you can drink and you can drive a car, it's not illegal, that conflicts with what you believe? Who agrees with [Juror R.N.]?*

(Emphasis added.) Juror C.J. did not raise her hand in response to this last question. And defense counsel never questioned Juror C.J. further concerning her earlier raised hand.

11

¶ 22    Later, defense counsel asked about a defendant's right to remain silent and said, "If you're accused of doing something wrong, who thinks you should explain yourself?  I see some head nodding. I want to see a hand raised."  Juror C.J. was among those jurors who raised their hands, but defense counsel never asked her any further questions.

¶ 23    During the subsequent bench conference, defense counsel said, "I challenge [C.J.] for cause on the same grounds [as R.N.].  I did not get as much information from her, but she did raise her hand and agree with [R.N.] with the impairment, so I make the same constitutional and statutory motion for cause on [C.J.]."  Defense counsel did not challenge Juror C.J. based on the defendant's right to remain silent.

¶ 24    Concerning Juror C.J., the prosecutor responded:

> [C.J.], the mere fact that she agreed with some other people [sic].  There was no statement, [that she] could not follow the law.  There was no ultimate statement that actually conflicts or would bring about [sic].  It's just [defense counsel's] gut feeling that he thinks maybe she couldn't.  She needs to actually be confronted with the, the idea that she couldn't follow the law and say that she couldn't follow the law.  And that was not the case with [C.J.].

12

¶ 25    The trial court agreed with the prosecution and said:

> With regard to [C.J.], while she raised her hand in response to a question (indiscernible) she was not specifically asked about (indiscernible), nor did she specifically state [that] she would not follow the law.  I can't find just by her — her raised [hand] that she is subject to a cause challenge, to a valid cause challenge (indiscernible).  [The challenge to C.J.] is denied.

¶ 26    After voir dire, both parties exercised peremptory challenges to excuse several jurors.  The defense did not exercise a peremptory challenge to remove Juror C.J.

### B.    Standard of Review and Law

¶ 27    We will overturn a trial court's ruling on a challenge for cause only upon an affirmative showing that the court abused its discretion, *Carrillo v. People*, 974 P.2d 478, 485 (Colo. 1999); that is, only if there is no evidence in the record to support the ruling, *People v. Richardson*, 58 P.3d 1039, 1042-43 (Colo. App. 2002).  This is a "very high standard of review" that accords deference to the trial court's superior ability to assess a potential juror's credibility, demeanor, and sincerity.  *People v. Young*, 16 P.3d 821, 824 (Colo. 2001) (quoting *Carrillo*, 974 P.2d at 485-86); *Morrison v. People*, 19 P.3d 668, 672 (Colo. 2000).

13

¶ 28     In determining whether a court abused its discretion in ruling on a challenge for cause, we must review the entire voir dire of the prospective juror. *Carrillo*, 974 P.2d at 486. If the trial court abused its discretion, we must conduct an "outcome-determinative" analysis to determine whether the error warrants reversal, if the defendant used a peremptory challenge to excuse the wrongful juror. *Abu-Nantambu-El*, ¶ 22. However, if the defendant fails to use a peremptory challenge to dismiss a biased juror, and the juror serves on the jury, the erroneous seating of the biased juror is structural error requiring reversal. *See Richardson v. People*, 2020 CO 46, ¶ 28.

¶ 29     To protect a defendant's right to an impartial jury, a trial court must excuse prejudiced or biased persons from the jury. *See* § 16-10-103(1)(j), C.R.S. 2019; *Nailor v. People*, 200 Colo. 30, 31-32, 612 P.2d 79, 80 (1980). "Actual bias is a state of mind that prevents a juror from deciding the case impartially and without prejudice to a substantial right of one of the parties." *People v. Macrander*, 828 P.2d 234, 238 (Colo. 1992), *overruled on other grounds by Novotny*, 2014 CO 18.

14

¶ 30     When a prospective juror makes a statement evincing bias, she may nonetheless serve if she agrees to set aside any preconceived notions and make a decision based on the evidence and the court's instructions. *People v. Phillips*, 219 P.3d 798, 801 (Colo. App. 2009). It is within the trial court's discretion to accept a juror's statements that she would base her decision on the evidence presented at trial. *See Carrillo*, 974 P.2d at 485.

¶ 31     A juror who initially misunderstands the law should not be removed for cause if, after explanation and rehabilitative efforts, the court believes that she can render a fair and impartial verdict based on the instructions given by the judge and the evidence presented at trial. *People v. Clemens*, 2017 CO 89, ¶ 16. The court must examine the juror's statements or silence in light of the totality of the circumstances. *Id.* at ¶ 20. "[A] prospective juror's silence in response to rehabilitative questioning constitutes evidence that the juror has been rehabilitated when the context of that silence indicates that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial." *Id.* at ¶ 19.

## C. Preservation

¶ 32    The People concede that Mr. Ambrose preserved the first issue related to the drinking and driving question.  However, they argue that defense counsel never challenged Juror C.J. for cause based on the second question concerning the right to remain silent.  Mr. Ambrose responds that he preserved both issues by asking Juror C.J. to be excused for cause because she was biased.  Because defense counsel alleged bias only with regard to the first issue, and never mentioned or argued Juror C.J.'s raised hand to the right to remain silent question, we agree with the People that the first issue is preserved, and the second issue is not.

¶ 33    If a party fails to raise a matter pertaining to the qualifications and competency of a prospective juror before the jury is sworn in, the matter "shall be deemed waived."  Crim. P. 24(b)(2).  Hence, when a party fails to preserve a for-cause challenge, the appellate court will "decline to address for the first time on appeal a different ground that was not clearly brought to the attention of the trial court and opposing counsel."  *People v. Coughlin,* 304 P.3d 575, 580 (Colo. App. 2011).  Because defense counsel failed to preserve a challenge to Juror C.J. based on the right to remain silent question

16

before the jury was sworn, we conclude that it is waived and decline to consider it. *See People v. Cevallos-Acosta*, 140 P.3d 116, 122 (Colo. App. 2005) (the "defendant abandoned his challenge for cause to [a prospective juror] by failing to [renew his] request that the trial court grant or deny [the challenge] before exercising a peremptory challenge to excuse her"); *People v. Coleman*, 844 P.2d 1215, 1218 (Colo. App. 1992) (declining to address the defendant's for-cause challenge on the grounds of bias "because defendant did not present the issue of any actual, or implied, prejudice in the trial court," but instead challenged the juror on another basis).

## D. Analysis

¶ 34 Based on the record before us, we are satisfied that the trial court's decision to deny Mr. Ambrose's challenge for cause was not an abuse of discretion. Although Juror C.J. raised her hand in response to defense counsel's question concerning whether it was "never okay" to "have a beer and then go drive a car," she did not raise her hand at the conclusion of Juror R.N.'s questioning when counsel asked whether any of the jurors agreed with Juror R.N. And defense counsel did not further question Juror C.J. concerning an inability to be fair. The absence of this further questioning,

17

when considered with the absence of raised hands to the prosecutor's questions about the panel's ability to be fair and impartial, leaves a record containing no evidence that Juror C.J. was unable to be fair and impartial, or that she would be unable to follow the law. Consequently, Juror C.J. displayed no bias or enmity against Mr. Ambrose, and we discern no error in the court's ruling denying Mr. Ambrose's challenge for cause.

## IV. Felony DWAI Prior Convictions

¶ 35    Mr. Ambrose next contends that his prior driving under the influence (DUI) convictions are an element of the offense (not a sentence enhancer) of felony DWAI that entitled him to have a jury decide the matter beyond a reasonable doubt.

¶ 36    We note that the supreme court granted certiorari on this issue in *Linnebur v. People*, No. 18SC884, 2019 WL 3934483 (Colo. Aug. 19, 2019) (unpublished order). However, we still must decide the case before us.

¶ 37    We review the construction of statutes de novo. *Lobato v. Indus. Claim Appeals Office*, 105 P.3d 220, 223 (Colo. 2005). A sentence enhancement from a misdemeanor to a felony is not an element of the offense if (1) the defendant may be convicted of the

underlying offense without any proof regarding the sentence enhancer and (2) the sentence enhancement provision only increases the potential punishment. *People v. Schreiber*, 226 P.3d 1221, 1223 (Colo. App. 2009).

¶ 38    The crime of DWAI is defined in section 42-4-1301, C.R.S. 2019:

> A person who drives a motor vehicle or vehicle while impaired by alcohol or by one or more drugs . . . commits driving while ability impaired. Driving while ability impaired is a misdemeanor, but it is a class 4 felony if the violation occurred after three or more prior convictions, arising out of separate and distinct criminal episodes, for DUI, DUI per se, or DWAI . . . .

§ 42-4-1301(1)(b).

¶ 39    This section is virtually identical to the definitions of DUI and DUI per se in section 42-4-1301(1)(a), (2)(a). Divisions of this court are split as to whether prior convictions constitute sentence enhancers or elements of the felony DUI or DWAI offense. The divisions in *People v. Jiron*, 2020 COA 36, ¶ 14, *People v. Quezada-Caro*, 2019 COA 155, ¶¶ 10-31, and *People v. Gwinn*, 2018 COA 130, ¶¶ 49-50, held that prior DUI convictions constitute a sentence enhancer that can be proved to the court by a

preponderance of the evidence. A division of this court in *People v. Viburg*, 2020 COA 8M, however, departed from *Gwinn* and *Quezada-Caro*, and held that prior convictions are an element of the felony offense that must be proved to a jury (if the defendant asks for one) beyond a reasonable doubt. *Id.* at ¶¶ 6-31.

¶ 40 We decline to follow *Viburg*, and for the reasons stated in *Jiron*, *Gwinn*, and *Quezada-Caro*, we conclude that the court did not err by denying defendant's motion to have a jury decide the issue of his prior convictions.

## V. *Shreck* Hearing

¶ 41 Mr. Ambrose next contends that the trial court erroneously admitted I-9000 evidence without first holding a hearing to assess its reliability under *People v. Shreck*, 22 P.3d 68 (Colo. 2001). We disagree.

### A. Additional Facts

¶ 42 Before trial, Mr. Ambrose requested a hearing to determine the reliability and relevance of the I-9000 device under *Shreck*. Attached to his motion were numerous press articles describing allegations that certain I-9000 certificates in Colorado had been fraudulently obtained and generated. He also challenged the

I-9000's inner workings and the reliability of the device's underlying

science. The trial court found as follows:

> Colorado Revised Statutes 42-4-1301 requires courts to take judicial notice of the testing methods and of the design and operation of testing devices, as certified by the Colorado Department of Public Health [and] Environment to determine a person's alcohol level. As recognized by the Court in *People v. Bowers*, 716 P.2d 471, Colorado Supreme Court case from 1986. Once CDPHE certifies a methodology of testing for a device, the Court may take judicial notice of the reliability of the methodology and the device without the necessity for further proof.
>
> So here, the statutory scheme in Colorado provides that [if a] breath device and method [are] certified by CDPHE, the Court is to take judicial notice of [their] reliability. The burden is on the prosecution at trial to determine that the testing devices were certified, were in proper working order, and operated by a qualified person and operated within substantial compliance with CDPHE regulations. If those things are satisfied, the results are admissible. *Thomas v. People*, 895 P.2d 1040, Colorado 1995.
>
> I have reviewed the defendant's motion for a [*Shreck*] hearing on the reliability and admissibility, and I've reviewed the attached news articles and [Judge Taylor's Order] out of Gilpin [County] from last summer related to the device issues that occurred around the rollout of the [I-9000s] in 2013 and used by CDPHE of an expired — or the signature of an

individual who no longer worked at that department.

Notably in Judge Taylor's conclusion was the statement that if the People can show the [I-9000] was in proper working order without the instrument certificate that was the one with the faulty signature, the BAC results may be admissible. Judge Taylor's Order, while [it is] interesting and instructive with regard to the [I-9000] certification process and the inadmissibility in the context of that case of an instrument certificate, it did not address whether a defendant is entitled to a [*Shreck*] hearing on the Intoxilyzer.

Here, I do find that the breath tests in the Intoxilyzer are not a new or novel science, such that the Court needs to hold an evidentiary hearing to address the reliability of the science. Certainly[,] the case law with regard to the admissibility about breath tests is from, for example, *Bowers* came out in 1986, *Thomas* came out in 1995, so we're talking about 25, 30 years of information regarding the reliability of breath testing. I cannot find that it's a new or novel science.

I find that the admissibility and reliability of the breath test is an issue for trial being the prosecution must put on sufficient evidence, as I said before, that the device was certified, proper working order, operated by a qualified person and in substantial compliance with CDPHE regulations. The defendant will be afforded the ability to object both to the admission based on the record at trial and to cross-examine . . . or present other evidence that may attack the weight the jury gives

[indiscernible] evidence. But the defendant's request for a [*Shreck*] hearing on the breath testing device in this case is denied.

¶ 43 The prosecutor later endorsed Deputy Dilka as an expert in standard sobriety roadside maneuvers and the operation and functionality of the I-9000 device. Mr. Ambrose objected to the endorsement as untimely and reiterated his concerns under *Shreck*. At a subsequent hearing, defense counsel explained that the endorsement "calls into question how the Court could rule on a *Shreck* motion regarding the . . . machine." The court did not readdress the *Shreck* issue but, instead, offered the defense a continuance of the trial for up to one month to endorse its own expert. The defense did not request a continuance.

B. Legal Framework and Standard of Review

¶ 44 CRE 702 governs the admissibility of expert testimony. It states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, [then] a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

23

¶ 45 Scientific evidence is admissible under CRE 702 if it is both relevant and reliable. *Shreck*, 22 P.3d at 77; *People v. Friend*, 2014 COA 123M, ¶ 28, *aff'd in part and rev'd in part*, 2018 CO 90. In determining the admissibility of expert testimony, the trial court conducts a *Shreck* analysis, which requires the proponent to show that (1) the scientific principles at issue are reasonably reliable; (2) the witness is qualified; (3) the testimony would be helpful to the jury; and (4) the evidence satisfies CRE 403. *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011); *Friend*, ¶ 28. The purpose of this inquiry is to determine whether the proffered evidence is reliable and relevant, and for the trial court — acting as gatekeeper — to prevent the admission of "junk" science. *People v. Wilson*, 2013 COA 75, ¶ 22; *Estate of Ford v. Eicher*, 220 P.3d 939, 942 (Colo. App. 2008), *aff'd*, 250 P.3d 262 (Colo. 2011). The trial court's reliability inquiry should be "broad in nature and consider the totality of the circumstances" specific to each case. *Shreck*, 22 P.3d at 77.

¶ 46 When a party requests a *Shreck* analysis, the court may, in its discretion, determine whether an evidentiary hearing would be helpful. *Rector*, 248 P.3d at 1201. However, the trial court is not

24

required to conduct a hearing if it "already has sufficient information to make specific findings under *Shreck*." *People v. Campbell*, 2018 COA 5, ¶ 41 (citation omitted). "Concerns about conflicting theories or the reliability of scientific principles go to the weight of the evidence, not its admissibility." *Id.* at ¶ 42 (citing *Estate of Ford*, 250 P.3d at 269). These concerns are mitigated by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *Shreck*, 22 P.3d at 78.

¶ 47　　"We review a trial court's evidentiary ruling for an abuse of discretion." *Campbell*, ¶ 38. The trial court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair." *Id.* (citation omitted). And we review any error in denying a *Shreck* hearing for nonconstitutional harmless error. *Wilson*, ¶ 24. An error is harmless if a reviewing court can say with fair assurance that, in light of the record as a whole, the error did not substantially influence the verdict or impair the trial's fairness. *Id.*

¶ 48　　Section 42-4-1301(6)(c) provides that

> (I) . . . [the trial court] *shall* take judicial notice
> of methods of testing a person's alcohol or
> drug level and of the design and operation of
> devices, as certified by the department of
> public health and environment, for testing a

person's blood, breath, saliva, or urine to determine such person's alcohol or drug level. . . .

(II) Nothing in this paragraph (c) prevents the necessity of establishing during a trial that the testing devices used were working properly and were properly operated. Nothing in this paragraph (c) precludes a defendant from offering evidence concerning the accuracy of testing devices.

(Emphasis added.)

¶ 49 In *People v. Bowers,* our supreme court stated that "[b]reath tests to determine the concentration of alcohol in a suspect's breath have long been recognized as valid scientific evidence." 716 P.2d 471, 473 (Colo. 1986). The court also concluded that the statute delegated authority to the Board of Health (which was later replaced by the Colorado Department of Public Health and Environment (CDPHE)) to "prescribe scientifically valid procedures for chemical testing that will not only ensure safety in the testing process but . . . will [also] provide sufficient reliability to the testing method as to avoid the necessity of formal evidentiary proof on this aspect of the testing process." *Id.* at 474. The requirement for courts to take judicial notice of the methods of testing a person's alcohol content means "[t]he legislature obviously believed that the testing

26

methods prescribed in the rules of [CDPHE] would be reasonably reliable, thus justifying the court in taking judicial notice of the testing method and thereby dispensing with the requirement of formal proof on that matter." *Id.*

## C. Analysis

¶ 50 We discern no abuse of discretion in the trial court's denial of a *Shreck* hearing, for two reasons. First, by employing the mandatory word "shall," section 42-4-1301(6)(c)(I) expressly instructs courts to take judicial notice of the methods of testing a person's alcohol level as certified by CDPHE. *People v. Dist. Court,* 713 P.2d 918, 921 (Colo. 1986) (noting that the Colorado Supreme Court "has consistently held that the use of the word 'shall' in a statute is usually deemed to involve a mandatory connotation"). Second, the record reflects that the I-9000 machine used in this case was certified by CDPHE,[2] and Deputy Dilka testified that the machine was working properly.

---

[2] We note that Mr. Ambrose challenges separately whether the I-9000 used in this case was in fact certified by CDPHE because the certificate lacked a signature. We address that contention below.

27

¶ 51    We are not persuaded that the news articles attached to Mr. Ambrose's motion relating to alleged fraudulent certification of other I-9000 machines require a different result.  These issues go to the weight of the evidence and not its admissibility and are properly explored through cross-examination or the presentation of other evidence.  *See Shreck*, 22 P.3d at 78.  Moreover, neither the statute nor the trial court's order precluded Mr. Ambrose from introducing evidence at trial challenging the reliability of breath tests.  *See* § 42-4-1301(6)(c)(II).

¶ 52    Further, we are not convinced that the prosecution's late endorsement of Deputy Dilka as an expert witness necessitates a different result.  Mr. Ambrose does not separately challenge the timeliness of the endorsement, so we do not consider it further.  *People v. Plancarte*, 232 P.3d 186, 193 (Colo. App. 2009) (declining to consider an issue defendant did not raise in his opening brief).  And, the prosecutor never qualified Deputy Dilka as an expert at trial.  Finally, the trial court offered the defense a reasonable remedy to any late endorsement — to continue the trial so that defense counsel could endorse his own witness.  Counsel refused

28

this offer.  Accordingly, we discern no abuse of discretion in the court's ruling denying a *Shreck* hearing.

## VI.    Expert Versus Lay Testimony

¶ 53     Mr. Ambrose next contends that Deputy Dilka's testimony about the I-9000, specifically that the machine worked properly, constituted expert testimony in the guise of lay testimony.  We conclude that any error was harmless.

### A.    Standard of Review and Law

¶ 54     Again, we review a trial court's evidentiary rulings for an abuse of discretion.  *Venalonzo v. People*, 2017 CO 9, ¶ 15.  A trial court abuses its discretion when its ruling is unreasonable, arbitrary, or contrary to law.  *Id.*  Preserved errors in the admission of evidence are reviewed under the harmless error standard.  *People v. Stewart*, 55 P.3d 107, 124 (Colo. 2002).  Such a ruling is not reversible "unless the ruling affects a substantial right of the party against whom the ruling is made."  *Id.*  "If a reviewing court can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial, the error may properly be deemed harmless."  *Id.* (citations omitted).

¶ 55    CRE 701 and 702 distinguish lay and expert testimony. Under CRE 701, a lay opinion must be "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [CRE] 702." Under CRE 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

¶ 56    A witness's basis for his opinion and the nature of the experiences that form such opinion distinguish lay testimony from expert testimony. *Venalonzo*, ¶ 22; *see Stewart*, 55 P.3d at 123. With lay opinion testimony, "courts consider whether ordinary citizens can be expected to know certain information or to have had certain experiences." *Venalonzo*, ¶ 22 (quoting *People v. Rincon*, 140 P.3d 976, 982 (Colo. App. 2005)). On the other hand, expert testimony requires experience or skills that go beyond common experience. *Id.* Therefore, a trial court must look to the basis for

the witness's opinion in order to determine whether it amounts to lay or expert testimony. *Id.* at ¶ 23.

## B. Application

¶ 57 Deputy Dilka testified about the step-by-step procedures he followed when operating the I-9000 machine, including testing air blanks before testing Mr. Ambrose's breath. He also testified about the results the machine generated at each step, including "zero" readings for air blanks and a 0.063 reading for Mr. Ambrose's sample. After Deputy Dilka had described the process and results generated, the prosecutor asked him whether it appeared to him that the I-9000 machine used here "was working properly." He responded, "It does." The prosecutor then admitted the machine-generated report describing the data generated. *See Stewart*, 55 P.3d at 123 (a police officer's testimony about his experiences and perceptions is lay opinion testimony).

¶ 58 We acknowledge that Deputy Dilka's opinion is arguably an expert opinion because it was based on specialized training that he received in the operation of the I-9000. *See Venalonzo*, ¶ 23 (if "the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is

31

offering expert testimony"); *People v. Veren*, 140 P.3d 131, 136 (Colo. App. 2005) ("[W]hen an officer's opinions require the application of, or reliance on, specialized skills or training, the officer must be qualified as an expert before offering such testimony." (quoting *Stewart*, 55 P.3d at 123)). The prosecutor did not qualify Deputy Dilka as an expert, however.

¶ 59    Nevertheless, we conclude that any error was harmless because Deputy Dilka's testimony did not substantially influence the verdict or the fairness of the trial. First, the prosecution presented substantial evidence of Mr. Ambrose's impairment. *See Campbell v. People*, 2019 CO 66, ¶¶ 41-42 (improperly admitting an officer's expert testimony about the horizontal gaze nystagmus test was harmless because other evidence, including the defendant's performance on other field sobriety tests, overwhelmingly supported the jury's conclusion that the defendant's ability to drive was impaired by alcohol). Deputy Dilka described Mr. Ambrose's glassy eyes, an odor of alcohol on Mr. Ambrose's person, and Mr. Ambrose's failure of several roadside sobriety tests, all of which are indicative of impairment.

¶ 60    As well, Deputy Dilka never interpreted the I-9000's results and never opined that the I-9000 indicated Mr. Ambrose was impaired.  Unlike *Veren*, where the division found that the improperly admitted opinion constituted the only evidence of distribution used to convict the defendant of distribution of a controlled substance, 140 P.3d at 140, the jury here had substantial other evidence, beyond the breath test, from which to determine that Mr. Ambrose was impaired to the slightest degree.  Accordingly, we discern no reversible error in the admission of Deputy Dilka's opinion.

## VII.   I-9000 Certificate

¶ 61    Mr. Ambrose next contends that the I-9000 certificate and results are inadmissible as a matter of law because the certificate, printed by the machine at the time of the test, lacks a signature.  So, he says, the trial court abused its discretion by admitting it.  We disagree.

¶ 62    As noted above, we review a trial court's evidentiary rulings for an abuse of discretion.  *Nicholls v. People*, 2017 CO 71, ¶ 17.

¶ 63    Section 42-4-1303, C.R.S. 2019, provides as follows:

Official records of the department of public health and environment relating to certification of breath test instruments, certification of operators and operator instructors of breath test instruments, certification of standard solutions, and certification of laboratories shall be official records of the state, and copies thereof, *attested by the executive director of the department of public health and environment* or the director's deputy and accompanied by a certificate bearing the official seal for said department that the executive director or the director's deputy has custody of said records, *shall be admissible in all courts of record and shall constitute prima facie proof of the information contained therein.* The department seal required under this section may also consist of a rubber stamp producing a facsimile of the seal stamped upon the document.

(Emphasis added.) Our supreme court has held that "any deficiency in the evidence with respect to the state board of health certifications should be considered as to the weight to be given the test results and not as to their admissibility." *Thomas v. People*, 895 P.2d 1040, 1046 (Colo. 1995).

¶ 64    The parties do not dispute that the I-9000 certificate was not signed by the executive director of CDPHE, or that it included the department's seal. Even assuming without deciding that the statute requires a signature, we apply our supreme court's rule that

34

any such deficiency goes to the weight of the evidence and not its admissibility. *See id.* Therefore, we discern no error by the trial court in admitting the certificate, and we need not address the People's or Mr. Ambrose's statutory arguments.

## VIII. Confrontation

¶ 65 Mr. Ambrose next contends that, if the I-9000 certificate is admissible under section 42-4-1303, then it is testimonial, and the statute violates his Sixth Amendment right to confrontation both facially and as applied. Specifically, he argues that if section 42-4-1303 allows the prosecutor to avoid calling the state analyst who certified the machine, without proving that the analyst was unavailable, the statute violates his right to confront witnesses. We are not persuaded.

### A. Standard of Review

¶ 66 As previously stated, we review a court's evidentiary rulings for an abuse of discretion. *Nicholls*, ¶ 17. But possible violations of the Confrontation Clause are reviewed de novo. *Bernal v. People*, 44 P.3d 184, 198 (Colo. 2002). Statutory interpretation is also reviewed de novo. *McCoy v. People*, 2019 CO 44, ¶ 37.

¶ 67    We review preserved evidentiary errors under the harmless error standard and confrontation violations under the constitutional harmless error standard. *Hagos v. People*, 2012 CO 63, ¶¶ 11-12. However, we review unpreserved errors — constitutional and nonconstitutional — for plain error. *Id.* at ¶ 14; *People v. Barry*, 2015 COA 4, ¶ 65. "[U]nder plain error analysis, [the] defendant must establish that error occurred, that the error was obvious, and that the error's effect is so grave that it undermines the fundamental fairness of the trial itself and casts doubt upon the reliability of the conviction." *Barry*, ¶ 71.

### B.    Preservation

¶ 68    As a threshold matter, the parties dispute preservation of this issue. Mr. Ambrose argues that he preserved the issue in his motion for a *Shreck* hearing by asserting that

> [t]o the extent that the People argue Colo. Rev. Stat. §42-4-1303 permits admission of the I-9000 *results*, this argument fails to take into consideration the constitutional implications of admitting untested, unreliable, and potentially misleading evidence in violation of Rule 702, 403, and state and federal constitutional guarantees of Due Process and Confrontation.

(Emphasis added.)

36

¶ 69    Mr. Ambrose also relies on counsel's objection during trial to admission of the I-9000 certificate and the breath test results "as unreliable." The People argue that this was insufficient to preserve Mr. Ambrose's appellate argument that admission of the working order certificate violated his rights under the Confrontation Clause. The trial court did not rule on the confrontation issue when it denied defense counsel's motion for a *Shreck* hearing.

¶ 70    We acknowledge that a pretrial motion, like the one here, may preserve an evidentiary objection for appellate review "if the moving party fairly presents the issue to the court and the court issues a definitive ruling." *People v. Dinapoli*, 2015 COA 9, ¶ 20; *see also People v. Gross*, 39 P.3d 1279, 1281 (Colo. App. 2001) ("[W]here a party objects during a pretrial hearing on a motion in limine . . . the objector is entitled to assume that the trial court will adhere to its initial ruling and that the objection need not be repeated."). But a defendant may forfeit his right to fix a constitutional error by failing to make an adequate objection during trial. *Martinez v. People*, 2015 CO 16, ¶ 13. General objections are insufficient. *Id.* at ¶ 14. Although no "talismanic language" is required to preserve an argument for appeal, a party "must present the trial court with 'an

37

adequate opportunity to make findings of fact and conclusions of law' on the issue." *Id.* (citation omitted); *see also Phillips v. People*, 2019 CO 72, ¶ 12 (to preserve a claim for appellate review, the party asserting error must have supplied the right ground for the request and that conclusory boilerplate contentions constitute insufficient preservation).

¶ 71    Counsel's pretrial motion objected only to the I-9000's *results* and not to the certificate related to the machine's proper working condition.  As well, counsel objected to the admission of the I-9000 certificate and the breath test results during trial, but only "as unreliable," without mentioning or arguing the Confrontation Clause.  We conclude that the motion and this objection were insufficient to provide the trial court with a meaningful opportunity to determine whether the I-9000 certificate was testimonial and subject to the Confrontation Clause or whether section 42-4-1303 was unconstitutional, either facially or as applied.  Therefore, we conclude that Mr. Ambrose did not preserve the Confrontation Clause issue as framed in the opening brief, and we review for plain error.

## C. Applicable Law

¶ 72     "The Sixth Amendment of the United States Constitution affords to the accused the right 'to be confronted with the witnesses against him.'" *Marshall v. People*, 2013 CO 51, ¶ 15 (quoting U.S. Const. amend. VI); *see* Colo. Const. art. II, § 16 ("In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . . ."). When evaluating a potential Confrontation Clause violation, we must first determine whether the statement at issue was testimonial. *See Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). Admission of a testimonial hearsay statement against the defendant violates the Confrontation Clause unless the declarant is unavailable and the defendant had an opportunity to cross-examine the declarant. *Id.*

¶ 73     "[A]t a minimum, statements are testimonial if the declarant made them at a 'preliminary hearing, before a grand jury, or at a former trial; and [in] police interrogations.'" *People v. Vigil*, 127 P.3d 916, 921 (Colo. 2006) (citation omitted). Three formulations of statements qualify as testimonial in nature: (1) "ex parte in-court testimony or its functional equivalent," such as "affidavits, custodial examinations, prior testimony that the defendant was unable to

39

cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony or confessions"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* (quoting *Crawford*, 541 U.S. at 51-52).

¶ 74 In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the United States Supreme Court held that laboratory certificates reporting the results of forensic analyses performed on substances are functionally equivalent to affidavits. The Court determined that the affidavits are "testimonial," and therefore implicate a defendant's Sixth Amendment right to confront witnesses against him, because they are made for the purpose of establishing some material fact at the defendant's trial and under circumstances that would lead a reasonably objective witness to believe that the statements contained therein would be available for use at a later trial. *Id.* at 310-11.

¶ 75 Even before *Melendez-Diaz*, our supreme court held that laboratory reports are testimonial and subject to the Confrontation Clause. *Hinojos-Mendoza v. People*, 169 P.3d 662, 666 (Colo. 2007), *abrogated on other grounds by Phillips*, ¶¶ 32-33. The court rejected the rationale that a lab report qualifies as a business record and that the practice of weighing an undisputed substance "merely . . . authenticated the document." *Id.* (citation omitted). Instead, the court held that the lab report was testimonial for two reasons. First, the "report was prepared at the direction of the police and a copy of the report was transmitted to the district attorney's office"; thus, the court reasoned, there could be no serious dispute that the report's sole purpose was to analyze the substance found in anticipation of a criminal prosecution. *Id.* at 667. Second, the report admitted at trial established an element of the offense with which the defendant was charged. *Id.* The court reaffirmed this position a few years later. *See Marshall*, ¶ 15 ("The People appear to concede, and we agree, that the [lab] report in this case was testimonial in nature." (first citing *Bullcoming v. New Mexico*, 564 U.S. 647, 664-65 (2011); then citing *Hinojos-Mendoza*, 169 P.3d at 667)).

41

¶ 76    However, neither our supreme court nor the United States Supreme Court has decided whether a certificate used to establish that an intoxilyzer machine complies with state rules and regulations is testimonial and subject to the Confrontation Clause. But all of the state courts that have considered this issue have concluded that such certificates are not testimonial and do not implicate the Confrontation Clause. We hold that the I-9000 certificate here is not testimonial and reject Mr. Ambrose's facial and as-applied challenges to section 42-4-1303.

### D.    Analysis

¶ 77    The I-9000 certificate differs from the document at issue in *Melendez-Diaz* in three ways. First, the document in *Melendez-Diaz* contained forensic analysis results used to prove the identity of the illicit substance (an element of the crime) and was sworn before a notary public by the reporting analyst. *See* 557 U.S. at 308-09. In contrast, the I-9000 certificate contains no testing results, but simply certifies that the I-9000 machine complies with CDPHE-approved methods (not an element of a crime) to measure a person's BAC. *See Commonwealth v. Zeininger*, 947 N.E.2d 1060, 1069 (Mass. 2011) (distinguishing certificates of drug analysis

offered as direct proof of an element of the offense charged from Office of Alcohol Testing certification records, which "bear only on the admissibility or credibility of the evidence"); *People v. Pealer*, 985 N.E.2d 903, 907 (N.Y. 2013) (affirming breathalyzer testing certificates are not testimonial in part because they "do not directly inculpate defendant or prove an essential element of the charges against him"). Moreover, the I-9000 certificate did not include a sworn statement.

¶ 78    Second, unlike the document in *Melendez-Diaz*, the I-9000 certificate is not prepared in anticipation of a particular prosecution. *See State v. Bergin*, 217 P.3d 1087, 1089 (Or. Ct. App. 2009) ("[T]he person who performs the test of a machine's accuracy does so with no *particular* prosecutorial use in mind, and, indeed, there is no guarantee that the machine will ever, in fact, be used."). Instead, the certificate — which the I-9000 prints contemporaneously with the breath test result — contains only the machine's serial number, the date range of the certificate's validity, and CDPHE's seal, consistent with the statutory and regulatory requirements. *See* § 42-4-1304(4), C.R.S. 2019 (requiring the state board of health to promulgate rules and procedures for the

collection and testing of blood and breath samples for alcohol and drugs).  The fact that the certificate is printed contemporaneously with the test result does not mean that it is prepared for a specific prosecution.  *See Zeininger*, 947 N.E.2d at 1065 (explaining that the notation of certification at issue appeared "on the same report as the results of the breathalyzer test").

¶ 79      Finally, rather than proving the material fact of a person's BAC, the I-9000 certificate proves only that the device used to measure a person's BAC complies with state regulations.  Dep't of Pub. Health & Env't Reg. 4.1.3.2, 5 Code Colo. Regs. 1005-2 (requiring that CDPHE "certify each Evidential Breath Alcohol Test instrument initially and annually thereafter"); Dep't of Pub. Health & Env't Reg. 4.1.3.3, 5 Code Colo. Regs. 1005-2 (providing that CDPHE will issue a certificate for each instrument after initial certification and after each annual certification, with each certificate reflecting the instrument serial number and the dates of the certification period).  Indeed, the I-9000 certificate in this case did not mention Mr. Ambrose or his BAC result.  *See also Commonwealth v. Dyarman*, 73 A.3d 565, 569 (Pa. 2013) (distinguishing calibration and accuracy certificates for breath test

44

machines from the certificates in *Melendez-Diaz* because "the certificates at issue here did not provide any information regarding appellant's BAC or even refer to her").

¶ 80    We are not persuaded that the certificate, which showed the I-9000 was working properly, was testimonial simply because the breath test result, contained in a separate document, permitted the jury to infer that Mr. Ambrose was impaired. *See* § 42-4-1301(6)(a)(II); *see also People v. Hamilton*, 2019 COA 101, ¶¶ 24-26 (time stamps and similar information that a machine generates without human intervention are not "statements" and, thus, are not hearsay); *Cranston v. State*, 936 N.E.2d 342, 345 (Ind. Ct. App. 2010) (an evidence ticket produced by a chemical breath machine is not testimonial hearsay for purposes of the Sixth Amendment). The I-9000 certificate merely constitutes prima facie evidence that the I-9000 used to test Mr. Ambrose's breath complied with CDPHE regulations. *See People v. Ortega*, 2016 COA 148, ¶ 11 (attestation used merely to authenticate phone records was not testimonial and thus not subject to the Confrontation Clause).

¶ 81    And we agree with the decisions of other state courts that have found similar certificates nontestimonial because they "bear a more

attenuated relationship to conviction." *Bergin*, 217 P.3d at 1089;

*see also State v. Kramer*, 278 P.3d 431, 437 (Idaho Ct. App. 2012)

(Intoxilyzer 5000 certificates "were not direct proof of an element of

the crime of driving under the influence," but were "instead

admitted as proof that the testing instrument was working

properly"); *Dyarman*, 73 A.3d at 570 (calibration and accuracy

certificates do not establish an element of an offense, but instead

concern "the weight to be accorded to the test results").

¶ 82     Further, our conclusion is consistent with dictum in *Melendez-*

*Diaz*:

> Contrary to the dissent's suggestion, we do not
> hold, and it is not the case, that anyone whose
> testimony may be relevant in establishing the
> chain of custody, authenticity of the sample, or
> *accuracy of the testing device*, must appear in
> person as part of the prosecution's case. . . .
> *Additionally, documents prepared in the regular
> course of equipment maintenance may well
> qualify as nontestimonial records.*

557 U.S. at 311 n.1 (emphasis added) (citation omitted).

¶ 83     Indeed, Mr. Ambrose has not cited, nor have we found, any

case from any jurisdiction holding that certificates similar to the

I-9000 working order certificate are testimonial and subject to the

Confrontation Clause. *See Smith v. State*, 791 S.E.2d 418, 422 (Ga.

46

Ct. App. 2016) ("inspection certificates are not testimonial in nature"); *Jones v. State*, 982 N.E.2d 417, 428 (Ind. Ct. App. 2013) (reaffirming prior precedents and concluding such certificates are "nontestimonial"); *State v. Benson*, 287 P.3d 927, 932 (Kan. 2012) (holding "that [a] certificate of calibration is not a testimonial statement"); *State v. Britt*, 813 N.W.2d 434, 437 (Neb. 2012) (affirming that certificate by analyst who prepared breath test simulator solution used to test the device was not testimonial and therefore not subject to confrontation analysis); *State v. Dial*, 998 N.E.2d 821, 827 (Ohio Ct. App. 2013) (a certificate of a breath test machine using a new bottle of ethyl alcohol was not testimonial); *Anderson v. State*, 317 P.3d 1108, 1122 (Wyo. 2014) (annual certification of breathalyzer machines is not testimonial for purposes of the Confrontation Clause).

¶ 84 We are also not persuaded that *Barry* requires a different result, for three reasons. In *Barry*, ¶ 67, the emergency medical technician (EMT) who drew the defendant's blood for a blood alcohol test signed a certificate stating that she drew the blood by venipuncture and that she was an EMT. Colorado law authorizes EMTs to draw a person's blood for criminal investigations in

47

accordance with Colorado State Board of Health rules and regulations, and these rules require that the EMT collect the blood using venipuncture. *Id.* at ¶ 76. The EMT did not testify at trial, and a division of this court concluded that the EMT's certificate constituted a hearsay testimonial statement. *Id.* at ¶ 79.

¶ 85 First, unlike the EMT in *Barry*, Deputy Dilka, the person who collected the sample and tested it, testified at trial and was available for cross-examination both as to his procedures and as to the functioning of the equipment he used. Second, and in contrast to *Barry*, the I-9000 certificate validated the machine's proper functioning for a range of dates — not just for the prosecution of Mr. Ambrose's case. *See id.* at ¶ 67 (EMT's certificate was prepared specifically for the prosecution of the defendant); *see also Ramirez v. State*, 928 N.E.2d 214, 219-20 (Ind. Ct. App. 2010) (a certificate of inspection and compliance for a machine used in a chemical breath test was "not prepared for a particular prosecution of any one defendant"); *Bergin*, 217 P.3d at 1089. As well, the EMT's certificate was not merely a document "prepared in the regular course of equipment maintenance." *Melendez-Diaz*, 557 U.S. at 311 n.1.

¶ 86    And third, the I-9000 certificate is an official record that CDPHE is statutorily required to maintain.  Section 42-4-1304(4)(a) empowers and requires CDPHE to establish rules and procedures for certifying the collection and testing of blood and breath samples for alcohol and drugs, and those rules require that CDPHE annually certify instruments like the I-9000.  Dep't of Pub. Health & Env't Reg. 4.1.3.2, 5 Code Colo. Regs. 1005-2.  There are no similar statutory or regulatory requirements for an EMT to certify how he or she drew blood.

¶ 87    We are also not persuaded that *Bullcoming* requires a different result.  In *Bullcoming*, an analyst who did not perform the defendant's blood alcohol test testified about the results another analyst had obtained.  564 U.S. at 659-60.  The United States Supreme Court held that such testimony violated the defendant's confrontation right.  *Id.* at 657-58.  We find *Bullcoming* distinguishable for two reasons.  First, as explained above, the I-9000 certificate is not testimonial.  It does not prove a defendant's BAC or any other material fact, but, instead, establishes that the machine operates properly and complies with regulatory requirements.  Second, the individual responsible for using the

device and taking measurements, Deputy Dilka, testified at trial and, therefore, was available for cross-examination.

¶ 88    Finally, even if we were to find that an error occurred, we conclude that it would not constitute plain error given the plethora of case law from other jurisdictions finding similar certificates not testimonial.  *See People v. Pollard*, 2013 COA 31M, ¶ 41 (the uniformity with which numerous other courts have embraced a rule even in the absence of Colorado case law squarely on point is relevant to plain error analysis).

¶ 89    Accordingly, we hold that the I-9000 certificate is not testimonial and that its admission did not implicate Mr. Ambrose's right to confront witnesses.  We also conclude that section 42-4-1303 does not, facially or as applied, violate the Confrontation Clause.

IX.    Persistent Drunk Driver Surcharge

¶ 90    Mr. Ambrose last contends that the trial court violated his right to be free from double jeopardy by imposing the persistent drunk driver surcharge on the mittimus without first announcing it in open court at the sentencing hearing.  We disagree.

50

## A. Standard of Review and Relevant Law

¶ 91     We review de novo whether the court violated Mr. Ambrose's rights against double jeopardy. *People v. Cattaneo*, 2020 COA 40, ¶ 41.

¶ 92     The Double Jeopardy Clauses of the United States and Colorado Constitutions protect a defendant from being punished twice for the same offense. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18. We must determine whether the initial sentence imposed in open court, which omitted the persistent drunk driver surcharge, was lawful. *See Yeadon v. People*, 2020 CO 38, ¶ 8 (addressing whether the imposition of a similar drug offender surcharge violates double jeopardy). If the original sentence was illegal, it may be corrected at any time without violating double jeopardy — even if the correction increases the sentence — because a defendant has no legitimate expectation of finality in an illegal sentence. *See id.*; *Cattaneo*, ¶ 42.

¶ 93     "We review the legality of a sentence de novo." *Cattaneo*, ¶ 43. "Sentences that are inconsistent with the statutory scheme outlined by the legislature are illegal." *Id.* (quoting *People v. Rockwell*, 125 P.3d 410, 414 (Colo. 2005)).

51

## B.    Analysis

¶ 94    Mr. Ambrose was convicted of felony DWAI with three or more prior offenses, pursuant to section 42-4-1301(1)(b). This subjected him to incarceration, parole, and a persistent drunk driver surcharge. *See* § 18-1.3-401(1)(a)(V), C.R.S. 2019; § 42-4-1307(6.5), (10)(b), C.R.S. 2019. The court imposed the persistent drunk driver surcharge under section 42-4-1307(10)(b), which provides in relevant part that

> [p]ersons convicted of DUI, DUI per se, and DWAI are subject to a surcharge of at least one hundred dollars but no more than five hundred dollars to fund programs to reduce the number of persistent drunk drivers. The surcharge *shall be mandatory, and the court shall not have discretion to suspend or waive the surcharge; except that the court may suspend or waive the surcharge if the court determines that a person is indigent.*

(Emphasis added.)

¶ 95    Relying on the language that empowers the court to "suspend or waive the surcharge if the court determines that a person is indigent," Mr. Ambrose reasons that the surcharge is punishment because it is not mandatory in all cases. Consequently, he argues that the Double Jeopardy Clause precluded the court from entering

52

the surcharge on the mittimus after sentencing. We reject this argument. *See Yeadon*, ¶ 14; *Waddell v. People*, 2020 CO 39, ¶ 19; *see also People v. Smith*, 183 P.3d 726, 729 (Colo. App. 2008) ("Colorado Supreme Court decisions are binding on the Colorado Court of Appeals." (citing *People v. Close*, 22 P.3d 933, 936 (Colo. App. 2000))).

¶ 96 After laying out the surcharge's parameters, the statute subsequently says that the court "may suspend or waive the surcharge if the court determines that a person is indigent." § 42-4-1307(10)(b). As in *Cattaneo*, reading the statute as a whole and giving sensible effect to all of its parts, we conclude that the trial court had the authority to suspend or waive the surcharge only if it determined that the defendant was indigent. *See Cattaneo*, ¶ 48 (concluding that the authority to reduce or eliminate the drug offender surcharge exists "only to the extent the offender is unable to pay it"). The statute does not authorize a court to otherwise omit the surcharge without making such a finding. *See id.*

¶ 97 Mr. Ambrose did not argue at sentencing, nor did the court find, that he was indigent. Consequently, his original sentence without the surcharge was contrary to section 42-4-1307(10)(b) and

53

was, therefore, illegal.  *See Cattaneo*, ¶ 49.  The trial court could correct Mr. Ambrose's illegal sentence, without violating his rights against double jeopardy, at any time under Crim. P. 35(a).  *See Yeadon*, ¶ 15.

¶ 98     Therefore, we conclude there was no double jeopardy violation and affirm the court's imposition of the persistent drunk driver surcharge.

## X.     Conclusion

¶ 99     The judgment is affirmed.

JUDGE LIPINSKY concurs.

JUDGE TERRY concurs in part and dissents in part.

JUDGE TERRY, concurring in part and dissenting in part.

¶ 100　I concur in all parts of the majority's opinion except for Part IV, in which the majority concludes that prior convictions are not an element of the felony offense that must be proved to a jury beyond a reasonable doubt, and except for its ultimate affirmance of the felony DWAI conviction.

¶ 101　The majority's opinion relies on *People v. Gwinn*, 2018 COA 130, in which I concurred.　But appellate judges are free to change our minds on arguable issues of law, and I did so later, when I joined the opinion in *People v. Viburg*, 2020 COA 8M.　In deciding to concur in that opinion, I was persuaded by the *Viburg* division's reasoning, as well as by now-Chief Judge Bernard's partial dissent in *People v. Schreiber*, 226 P.3d 1221, 1225-27 (Colo. App. 2009) (Bernard, J., concurring in part and dissenting in part).　I still believe that *Viburg* came to the right conclusion on this very difficult legal issue.

¶ 102　As the majority notes, the question presented in this case is now before the supreme court in *Linnebur v. People*, (Colo. No. 18SC884, Aug. 19, 2019) (unpublished order).　Colorado's courts will benefit from further guidance on this issue.

¶ 103    In the meanwhile, I would reverse Ambrose's felony DWAI

conviction and remand for a jury trial on that charge.